UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN CHEUNG and SOUTH GARDEN, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 04-127-B-W |
| JAMES WAMBOLT, JILL WAMBOLT, THE INHABITANTS OF THE TOWN OF LINCOLN, and MICHAEL KNIGHTS, | ) ) ) ) ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

John Cheung, former owner of the now defunct South Garden Chinese restaurant, once located within premises situated in the Town of Lincoln and owned by defendants James and Jill Wambolt, maintains in this lawsuit that the Wambolts and their co-defendants, the "Inhabitants of the Town of Lincoln" and the Town's police chief conspired to destroy Cheung's restaurant and karaoke business based on discriminatory animus toward people of Asian descent. Now pending are the defendants' motions for summary judgment. I recommend that the court grant the motions.

**Facts**

As with all summary judgment motions, the availability of any claim-dispositive ruling depends on the quality of the parties' factual proffers. To determine whether there is a trial-worthy issue, I review the parties' competing summary judgment statements of material fact under the auspices of this District's Local Rule 56, as outlined in <u>Doe v. Solvay Pharms., Inc.</u>, 350 F. Supp. 2d 257, 259-60 (D. Me. 2004).

Plaintiff John Cheung is an American citizen of Chinese descent, born in China.  He has an incomplete, rudimentary knowledge of the English language.  (Pl. John Cheung's Statement of Additional Material Facts ("Cheung's Statement"), Docket Nos. 31 & 38, ¶ 1.)  Cheung operated the South Garden Chinese restaurant through his corporation South Garden, Inc., in a building adjacent to the Briarwood Motel in Lincoln beginning sometime prior to 2002.  (Def. Town's and Def. Michael Knights' Statement of Material Facts ("Town's Statement"), Docket No. 15, ¶ 2.) In February 2002, Defendants Jill and James Wambolt purchased both the Briarwood and the adjacent building that housed the South Garden restaurant.  Included with the restaurant building were some upstair apartments.  (Id. ¶ 1.)  On February 5, 2002, John Cheung, d/b/a South Garden, Inc., signed a 10-year lease agreement with the Wambolts for rental of the restaurant, not including the upstair apartments.  (Cheung's Statement ¶ 4.)

In August of 2002, the Lincoln Town Council approved the issuance of a Special Amusement Permit to Cheung d/b/a South Garden, who sought the permit in conjunction with a karaoke offering at South Garden.  (Town's Statement ¶ 3.)  Initially, the South Garden's karaoke event was limited to Friday evening and ended by approximately 10:00 p.m.  (Def. Wambolts' Statement of Material Facts ("Wambolts' Statement"), Docket No. 24, Elec. Attach. #1, ¶ 7.) According to their deposition testimony, the Wambolts and Cheung had generally positive attitudes about one another at the beginning of their landlord-tenant relationship.  John Cheung's impression of James Wambolt was that he was very helpful.  (Id. ¶ 8.)  The Wambolts patronized the South Garden and would also participate in karaoke on occasion.  (Id. ¶ 9.)  That relationship soured sometime in the summer of 2002, when South Garden expanded its karaoke entertainment to both Friday and Saturday nights and beyond the previously-observed 10:00 p.m. stop time. (Id. ¶ 12.)  According to the Wambolts, they observed people who were patronizing the South

Garden on karaoke nights act disorderly in the parking lot, drink alcohol in the parking lot, and "disrupt" the customers of the Briarwood Motel.  (<u>Id.</u> ¶ 13.)  On August 17, 2002, an officer of the Lincoln police department responded to a complaint from Jill Wambolt at 10:10 p.m. of loud music coming from the South Garden restaurant.  (Town's Statement ¶ 6.)  The officer reported that he spoke with the owner of the restaurant who said he would turn the music down.  (<u>Id.</u> ¶ 7.)  On August 23, 2002, an officer of the Lincoln police department responded to a complaint from Jim Wambolt at 11:19 p.m. that people outside the South Garden restaurant were making a lot of noise.  (<u>Id.</u> ¶ 8.)  The officer reported that he told the people outside to quiet down as they were bothering people trying to sleep in the motel.  (<u>Id.</u> ¶ 9.)

Defendant Michael Knights started working as a patrolman for the Town of Lincoln Police Department in 1988, was promoted to sergeant in 2002, and took over as acting chief of police in October of 2002.  (<u>Id.</u> ¶ 4.)  Sometime prior to August 30, 2002, Jim Wambolt complained to Knights that he was having problems with people coming out of the South Garden restaurant drunk, swinging on poles, urinating between cars, and knocking on doors at the Briarwood.  (<u>Id.</u> ¶ 10.)  Knights detailed an officer to go to the Briarwood on August 30, 2002, to observe what was happening with respect to allegations of people leaving the South Garden restaurant in a drunk and disorderly manner.  (<u>Id.</u> ¶ 11.)  The officer observed the restaurant and parking area from a room at the Briarwood from 9:30 p.m. until 1:15 a.m., and he reported observing one person driving away intoxicated, several subjects being very loud just outside the restaurant entrance, and small children outside with intoxicated individuals until approximately 1:00 a.m. (<u>Id.</u> ¶ 12.)  On August 30, 2002, Knights responded to a complaint from the defendants' daughter, Nikki Wambolt, that people were in the entrance of the South Garden

restaurant making excessive noise at 11:49 p.m.  (Id. ¶ 13.)  When Knights arrived there were just a couple of people present and they were quiet at the time. (Id. ¶ 14.)

Whatever efforts the Wambolts and Cheung made, if any, to resolve their differences as of late August were unproductive.  On August 20, 2002, the Wambolts notified Cheung that they were terminating the lease.  (Cheung's Statement ¶ 5.)  According to the Wambolts, they sought to evict Cheung and/or South Garden, Inc., on the ground that they believed South Garden was "operating beyond the scope of a restaurant," the purpose of the tenancy described in the lease. (Wambolts' Statement ¶ 14.)  They also assert that they sought to evict Cheung/South Garden because the "night club business" was interfering with the motel business and was problematic with respect to renting the apartments over the restaurant.  (Id. ¶¶ 30-31.)  Cheung resisted and the matter was heard in January 2003 before the Maine District Court in the context of a forcible entry and detainer (FED) action filed by the Wambolts.  (Id. ¶¶ 15, 24.)  Prior to that hearing, the Wambolts also sought relief through other channels, making complaints to, or seeking intervention from, the Bureau of Liquor Enforcement and the State Fire Marshall's Office. (Cheung's Statement ¶¶ 20-21.)  In addition, the Wambolts urged the Lincoln Town Council to rescind its approval of the South Garden's amusement permit.  (Id. ¶ 22.)  The Town Council was receptive to this urging and voted not to approve the renewal of South Garden's amusement permit in late October 2002.  (Id. ¶ 24.)

On January 10, 2003, the District Court found that operation of a karaoke bar in conjunction with the restaurant business was not a violation of the express terms of the parties' lease agreement and granted judgment in favor of Cheung.  (Cheung's Statement ¶¶ 7-12; see also Docket No. 31, Ex. 4.)  On January 21, 2003, at 11:12 p.m., police received a complaint involving loud music emanating from the restaurant at a time when it was closed to the public.

The police report indicated that the responding officer "spoke to the owner and advised him to turn off the music."  (Town's Statement ¶¶ 19-20.)

On March 10, 2003, the Town Council voted to issue a special amusement permit to the South Garden, despite the prior non-renewal of the permit.  (Cheung's Statement ¶ 24.)  Prior to, or on the date of this vote, Jim Wambolt appeared before the Council and spoke in opposition to the South Garden's application for the permit.  (Town's Statement ¶ 21; Wambolts' Statement ¶ 27.)  Despite Wambolt's opposition, the Council voted six to zero to grant the permit.  (Town's Statement ¶ 22.)  As a consequence of the Town's prior denial of an amusement permit, South Garden had been unable to offer karaoke to its patrons for roughly four and a half months.  (Cheung's Statement ¶¶ 24-25.)  Without karaoke South Garden suffered a loss of business.  (Id. ¶¶ 26-27.)

The day following the re-instatement of the South Garden's amusement permit, the Wambolts erected a line of saw-horses in parking spaces in front of the South Garden and erected a sign restricting the remaining parking spaces in the shared parking space to motel patrons.  (Id. ¶ 28.)  According to James Wambolt, he was trying to create a "fire lane safety zone" to ensure fire department access to the restaurant premises.[1]  (Id. ¶ 29.)  Of course, a somewhat more obvious inference comes to mind.  In any event, the saw horses did not prevent foot-traffic access to the restaurant, but significantly limited parking spaces for restaurant patrons, thereby discouraging but not preventing customers from patronizing the restaurant.[2]  (Id. ¶¶ 28-30, 33.)  Cheung went to the Town for help but was told by someone on the fire

---

[1]     Cheung makes reference to James Wambolt Deposition Exhibit 7, which I assume is a picture of the parking lot with the saw horses in place.  I have not been able to locate a copy of the picture on the electronic docket or in the paper docket.

[2]     In his statement of additional material facts, Cheung asserts that the saw horses "severely limited access" and "discouraged" patrons, but not that they physically prevented passage into or out of the restaurant.  (Cheung's Statement ¶¶ 29-30.)

department and a member of the police department that the Wambolts could do anything they wanted on their property and that the Town could not help.  (Id. ¶ 31.)  One patron defied the "fire lane" by driving his vehicle into or over one of the saw horses.  That individual was later issued a parking ticket by a Lincoln police officer for doing so, although the citation was subsequently dropped based on the Department's inability "to locate a source of legal authority to issue the ticket."  (Town's Statement ¶¶ 23-24, 26; see also Cheung's Statement ¶ 32.)  The Wambolts removed the saw horses after a few days when threatened with legal action in a letter from Cheung's counsel.  (Wambolt's Statement ¶ 28.)

On May 2, 2003 (a Friday), an officer of the Lincoln police department responded to a call at 11:45 p.m. that there was a fight at the South Garden restaurant.  (Town's Statement ¶ 27.)  The officer reported that before he arrived a man was at the Briarwood punching a wooden post that supports an upper deck.  (Id. ¶ 28.)  Subsequently that month the Wambolts twice requested that special details be assigned to the Briarwood.[3]  (Id. ¶ 32.)  Knights authorized special details on May 9 and May 16, 2003 (the two subsequent Friday nights).  (Id. ¶ 33.)  According to Knights, he instructed the officers to stay on the Briarwood premises, unless something criminal transpired, and to make sure nobody came onto the Briarwood premises and did damage to the premises or the property of the Briarwood's patrons.  (Id. ¶ 34.)  According to Cheung, in addition to these special details, officers sometimes sat in their squad cars next to the South Garden restaurant and frequently did drive-bys in the parking lot and near the restaurant's off-street entrance.  (Cheung's Statement ¶ 34.)  Cheung asserts that the presence of uniformed officers had an intimidating effect on the restaurant's patrons and a deleterious effect on the income of the South Garden.  (Id. ¶ 35.)

_____

[3]      These were the second and third special details assigned to the Briarwood, including the August 30, 2002, detail in which an officer observed the restaurant and parking area from within a room at the Briarwood.  Unlike the August detail, the Wambolts paid for the May details.

Article 5 of the collective bargaining agreement between Lincoln and its police department provides for "special details," which are described as "consumer paid, non-patrol assignments."  According to the agreement, such assignments are to be made available first to off-duty, full-time officers on the basis of seniority by rotation.  Lincoln collects the fees for special details and the officers are paid at rates set forth elsewhere in the agreement.  (Id. ¶ 35.) At a June 9, 2003, regular Lincoln Town Council Meeting there was a discussion about the special details that Knights had authorized for the Briarwood.  (Id. ¶ 36.)  The meeting minutes reflect that the town manager said Lincoln did not have a written policy governing when special details should be permitted, that traditionally they were limited to events sponsored by schools, non-profits and civic organizations, and that he had written a letter to Knights informing him that special details were henceforth to be conducted only for non-profits, civic organizations, or the school district and that no more details were to take place at the Briarwood.  (Id. ¶¶ 37-38.) Cheung asserts that a relevant policy was in effect that should have prevented the Briarwood special details from ever occurring.  Specifically, he points to the Town's "Standard Operating Procedures" manual, which states that its police officers shall take a neutral position in any dispute of a civil nature.  (Cheung's Statement ¶ 15.)  During his deposition, Knights acknowledged the existence of this policy and that all police officers are given copies of the standard operating procedures at the time of hire.  (Id. ¶ 16.)  According to Cheung, "the Lincoln Town Council and the Lincoln Police Department ignored [their] policies by favoring one private business over another."  (Id. ¶ 39.)

In July 2003 John Cheung closed South Garden and vacated the premises.  (Wambolt's Statement ¶ 36.)  According to the Wambolts, it was Cheung's own "business decision" to close the restaurant.  (Id.)  According to Cheung, he was "forced to close."  (Pl.'s Opp'n to Wambolts'

Statement, Docket No. 35, ¶ 36.)  Cheung also asserts that "as a result of the events leading up to the loss of his restaurant business in July 2003, [he] suffered psychological trauma, anxiety, depression, insomnia, and obsessive worries concerning his finances and ability to support his family."  (Cheung's Statement ¶ 45.)[4]

At some point the Wambolts evicted Engel Cheung, the plaintiff's brother, from an apartment they leased to him.  According to Engel, the Wambolts refused to give a reason for the eviction.  (Id. ¶ 47.)

The record is devoid of any direct evidence of race-based discriminatory animus.  In his statement of additional material facts, Cheung asserts in conclusory fashion that "the discriminatory conduct of the Wambolt's [sic] and the facilitation of the Wambolts' conduct by [the] Town of Lincoln and it's police department was motivated by racial animus."  (Cheung's Statement ¶ 48.)  The deposition testimony that Cheung cites in support of this contention (his own), reflects that at one point a customer told Cheung that Cheung would not be having problems if he were white or American (he is, in fact, an American citizen).  (Cheung Depo. at 25-26, 53.)  He also heard that another Chinese establishment that hosted karaoke in town did not survive for very long.  (Id. at 23-24.)  In addition, Cheung felt that the Wambolts tried to take advantage of his lack of proficiency in the English language when they served him with the notice to quit, asking him to sign "the letter,"[5] which Jill Wambolt described as a mere formality.  (Cheung Depo. at 54-55.)

---

[4]     The defendants deny that any of their actions caused the South Garden to be unsustainable from a business perspective and Cheung has not presented any business records reflecting that the business became unsustainable.

[5]     The factual statements do not make clear whether this request to sign a document concerned some kind of waiver of rights or merely an acknowledgement of service.  I also observe that in paragraph 4(a) of his answers to interrogatories, which Cheung cites in relation to paragraph 6 of his statement of additional facts, Cheung asserts that James Wambolt "wanted my restaurant to shut down so he could run it along with his motel," a non-discriminatory reason for the Wambolts efforts to evict Cheung.  (Docket No. 31, Elec. Attach. #5.)

**Discussion**

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Cheung's complaint recites the following counts:

1.      "Conspiracy/§1985";

2.      "Intentional Infliction/§ 1983";

3.      "Negligent Infliction/§ 1983";

4.      § 1981;

5.      Intentional Infliction of Emotional Distress;

6.      Negligent Infliction of Emotional Distress;

7.      Interference with Prospective Economic Advantage;

8.      "5 M.R.S. § 4684-B, Maine Civil Rights Act: Intentional Interference with the

Exercise and Enjoyment of Property Rights"; and

9.      Punitive Damages.

Of these nine counts, only the first four raise federal questions.  The Town defendants contend

that they are entitled to summary judgment on the civil rights conspiracy claim because there is

no evidence of racial animus.  As for the § 1983 counts, they observe that state law tort theories

cannot support a federal civil rights claim under § 1983.  (Town of Lincoln and Michael Knight's

Mot. Summ. J. ("Town's Mot."), Docket No. 14, at 6, 9.)  As for the § 1981 claim, the Town

defendants argue that they are not susceptible to liability on this claim and, even if they are, there

is no evidence of intent to discriminate on the basis of race, which is required to support such a

claim.  (Id. at 12.)  The Wambolts similarly argue that they are entitled to summary judgment on

the conspiracy claim and the § 1981 claim because there is no evidence of racial animus,

intimidation or a conspiracy between the Wambolts and the Town defendants to deprive Cheung

of his civil rights.  (Wambolts' Mot. Summ. J., Docket No. 24, at 5-6, 8.)  The Wambolts do not

address the § 1983 claims, presumably because they are not state actors.  I address the federal

claims in the order in which they appear in Title 42 of the United States Code.

**A.      42 U.S.C. § 1981**

Title 42 U.S.C. § 1981 was enacted by Congress to deter discrimination based on race or

color in regard to the right "to make and enforce contracts, to sue, be parties, give evidence, and

to the full and equal benefit of all laws and proceedings for the security of persons and property."

42 U.S.C. § 1981(a).  "Where an alleged act of discrimination does not involve the impairment

of one of these specific rights, § 1981 provides no relief."  Patterson v. McLean Credit Union,

491 U.S. 164, 176 (1989).  However, where an enumerated right is impaired, § 1981 affords

10

redress whether or not the wrongful act is performed under color of state law.  Gen. Bldg.
Contractors Ass'n v. Pa., 458 U.S. 375, 387 & n.17 (1982).  Proof of the impairment of an
enumerated right is not, in itself, sufficient to maintain a § 1981 claim.  Liability under § 1981
must be premised upon proof of intentional racial discrimination.  Id. 388-89.

Cheung maintains that he has a viable § 1981 claim against the defendants because, in his
words:

> Michael Knights and the Town of Lincoln, in working with, and facilitating the
> conduct of the Wambolts against John Cheung, took several official actions by:
> revoking South Garden's amusement license, using the town police force to
> support one business against another, treating South Garden differently than all
> other businesses, and not remaining neutral in their dispute, using special police
> details to support private actions, failing to take action to curb the abuses of the
> special police details when placed on notice that such abuses were occurring, and
> using the police presence to intimidate and harass John Cheung and his
> customers.

(Mem. in Opp'n to Town's Mot., Docket No. 26, at 18.)  Cheung makes similar arguments
against the Wambolts, again focusing on the negative impact of their actions on his and the
South Garden restaurant's relationship with its patrons.  (Opp'n to Wambolts' Mot., Docket No.
34, at 14.)  I assume, for the sake of argument, that the conduct described would infringe upon
rights protected by § 1981.  I note that the Town has not argued otherwise, although the
Wambolts do contend in their memorandum that there is no real evidence that any customers
were ever prevented from contracting with the restaurant.  (Wambolts' Mot. at 9-10.)
Nevertheless, even assuming that the asserted conduct concerns rights protected by § 1981, there
is no evidence in the record of intentional racial discrimination by the defendants.  In support of
such a finding against the Town defendants, Cheung points to the following factors:

1.      He "is an immigrant ethnic Chinese, was born in China and has an
        incomplete, rudimentary knowledge of the English language."

2.      There was an "unjustified departure" from  the police policy of neutrality
        in regard to civil disputes between citizens.

3.      The police department closely surveilled the South Garden on behalf of
        the Wambolts and members of the department worked at the Wambolts'
        behest.

4.      The officers "intimidated Cheung's customers."

5.      The Town rescinded South Garden's amusement license.

6.      The Town officials refused to help Cheung "obtain a level playing field in
        his dispute with the Wambolts."

7.      The Town "singled out" Cheung, "as it never had other Lincoln citizens or
        businessmen."

(Mem. in Opp'n to Town's Mot. at 6-8, 18.)  In support of such a finding against the Wambolts,

Cheung points to the following factors:

1.      The Wambolts' efforts to terminate the lease, including the maintenance of
        a FED action.

2.      "A general pattern of harassment" that involved efforts to "enlist" the aid
        of the police, the liquor inspector, fire inspector and the Town Council.

3.      Successfully urging the Town Council to revoke the amusement permit.

4.      Making "numerous telephone calls to the Lincoln Police Department about
        disturbances in their own parking lot."

5.      Closing off parking spaces and physically limiting access to the South
        Garden restaurant.

(Opp'n to Wambolts' Mot. at 8-9.)  These several statements, despite being gilded in parts with

plaintiff-favorable characterizations of the record, do not suggest that Cheung's race or ethnicity

had anything to do with the matter and they also entirely overlook the stated rationale for the

defendants' conduct.  Indeed, this record presents absolutely no evidence that the Wambolts'

stated concern over the incompatibility of Cheung's karaoke bar with their motel and apartment

renting business was merely a pretext for discrimination.  Nor would this evidence in any way

12

contradict the fact that there were numerous incidents involving loud noise and disturbances in the evening and that police officers were dispatched or detailed on account of these complaints and reports.  Additionally, Cheung does not dispute that the Wambolts were once patrons of the South Garden restaurant and participated in karaoke, or that he considered James Wambolt to be "helpful" to him prior to the onset of consistent weekend karaoke sessions that continued late into the night.  Cheung also overlooks his own suspicion that the Wambolts' actions may have been motivated by a desire to get the restaurant back to run in conjunction with the motel.

Although this is not an employment discrimination case, Supreme Court precedent reflects that the Title VII scheme for uncovering discriminatory purpose is applicable.  See Patterson, 491 U.S. at 186 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and holding that the "scheme of proof" prescribed therein "should apply to claims of racial discrimination under § 1981").  Analyzing the summary judgment record generated by the parties through the McDonnell Douglas lens leads me to conclude that, even if the factors recited by Cheung are sufficient to state a *prima facie* case of race discrimination, those factors are not sufficient to override the absolute failure of Cheung to generate a genuine issue on the question of pretext.  To be sure, "intent to discriminate is rarely openly expressed," Old West End Ass'n v. Buckeye Fed. S & L, 675 F. Supp. 1100, 1105 (N. D. Ohio 1987) (finding a trial-worthy § 1981 claim where the plaintiff introduced evidence generating a question of pretext in a disparate impact case involving fair housing claims), but in this case there is not only an absence of any appreciable evidence of racial animosity, but also an absence of any evidence of pretext (i.e., evidence capable of generating a genuine issue of material fact whether the defendants' conduct was really the product of concern over disturbances that arose from the operation of a late-night karaoke

event adjacent to a private motel).  Cheung perhaps comes close to stating a *prima facie*

disparate treatment or disparate impact claim against the Town, but strikingly absent from the

record is any evidence of similarly-situated white residents or businesspeople being treated

differently under factually similar circumstances.  For instance, there is no evidence that anyone

ever before requested a police "special detail" in connection with a private dispute involving a

white bar or restaurant owner and that the Town or its police department rejected the request.[6]

Instead of offering actual evidence of different treatment accorded to white bar or restaurant

owners, Cheung offers only the absence of any similar situation:

> There were no other examples of the Town working with one business
> against another.

(Cheung's Statement ¶ 40.)  In support of this statement, Cheung relies on the deposition

testimony of Bruce Albert, a Lincoln town councilor.  In the cited portions of Mr. Albert's

deposition transcript is testimony indicating that, in Albert's view, special details ought not be

used in disputes between private parties.  (Albert Depo. at 19:18-22 & 20:17-19.)  Testimony

immediately following this statement reflects that, to Albert's knowledge, this was the first time

he was aware of a situation in which special details were used "where there was a situation of

one business versus another" and that it was also the first time the council, in his experience,

discussed (after the fact) whether special details should be used in these types of situations.  (Id.

at 19:23 – 20:6, 34:7-12.)   According to Albert, he indicated to both the town manager and

Knights that it ought not happen any more.  (Id. at 21:2-7.)  Viewed most favorably to Cheung,

this testimony would support a finding that the assignment of special details was unprecedented.

---

[6]     As an aside, it is not easy to see the causal connection between the three special details at the Briarwood and an infringement of any of the rights protected by § 1981.  Cheung has not endeavored to articulate a "class of one" equal protection claim, assuming he might have been able to advance such a claim as part of his § 1983 claim. See, e.g., Tapalian v. Tusino, 377 F.3d 1, 5-6 (1st Cir. 2004) (describing such a claim as requiring proof that state action amounted to a "gross abuse of power," or stemmed from malice or a bad faith intent to injure).

Additional facts in the record would support a finding that the details were also contrary to the Town's "traditional" policy. I assume that together these facts would support a *prima facie* claim against the Town defendants. However, the question still remains whether this unprecedented action, which was later rectified when the council's attention was focused on it, was the product of racial animosity or merely a function of Knights succumbing to pressure from the rather obtrusive Wambolts. The undisputed fact that the mayor took steps to prevent a recurrence once the matter was brought before the council is powerful evidence that the special details did not occur because of a municipal policy or practice calling for the police to disregard traditional policies where members of racial minorities are concerned. Viewing this record as a whole, my assessment is that the facts adduced by Cheung would not permit a reasonable jury to infer purposeful racial discrimination by any of the defendants; only to speculate as to its existence. In fact, a review of Cheung's own deposition testimony and interrogatory answers reflects that his own opinion as to the existence of discriminatory purpose is entirely conjectural. In support of his personal opinion, Cheung mentioned only his feeling that the Wambolts tried to take advantage of his poor understanding of the English language, the musings of an unidentified customer and hearsay information about another, unidentified Chinese restaurateur who had landlord trouble in conjunction with a karaoke amusement. In addition to these speculative concerns, Cheung also indicated in his answers to interrogatories that James Wambolt wanted to oust him from the restaurant so that Wambolt could run the restaurant himself, an entirely non-discriminatory rationale for the Wambolts' conduct. (See Cheung's Statement ¶¶ 6 & 48 and the materials cited therein). Such a claim must succumb to a competently executed summary judgment motion. Indeed, even when a plaintiff can generate a "weak" issue of fact as to pretext his claim will nevertheless be susceptible to dismissal at the summary judgment stage. See, e.g.,

Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47 (1st Cir. 2002).   In the absence of

evidence suggestive of racial animosity and in the absence of any evidence of pretext, I conclude

that Cheung fails to generate a trial-worthy issue as to the existence of discriminatory purpose

and that summary judgment should enter in favor of the defendants on the § 1981 claim (count

IV).

**B.      42 U.S.C. § 1983**

        Cheung asserts two claims under § 1983: one related to a claim of intentional infliction of

emotional distress and another related to a claim of negligent infliction of emotional distress.

These claims (counts II and III) are asserted solely against the Town defendants in view of the

requirement that a § 1983 act be premised on the performance of an act under color of state law.

(Opp'n to Wambolts' Mot. at 12-13, indicating that both counts "dealt with Defendants Town of

Lincoln and Michael Knights.")  In opposition to the Town defendants' motion for summary

judgment on these claims, Cheung briefs the claims exclusively in terms of Maine tort law.

(Mem. in Opp'n to Town's Mot. at 11-16.)  Of course, it is hornbook law that a § 1983 claim

requires the plaintiff to demonstrate a deprivation of one or more "rights secured by the

Constitution or laws of the United States," Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995),

because § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for

vindicating federal rights elsewhere conferred,'" Graham v. Connor, 490 U.S. 386, 393-94 (1989)

(quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  In paragraph 28 of his complaint

Cheung makes reference to "equal protection of the laws or the exercise of equal privileges and

immunities under the law," which paragraph is incorporated into his § 1983 counts.  (Compl. ¶¶

28, 30, 33.)  However, he has not presented any additional argument or facts in support of such a

claim and I assume that the arguments and evidence pertaining to the § 1981 claims would be

applicable to these claims as well.  If there is an additional federal or constitutional underpinning

for this claim, Cheung has not identified it in opposition to the Town defendants' motion and for

that reason summary judgment should be granted against the claims recited in counts II and III.[7]

**C.     42 U.S.C. § 1985**

As with the § 1981 claim, Cheung's claim under § 1985(3) for "conspiracy to interfere

with civil rights" cannot succeed without proof of "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action."  Griffin v. Breckenridge, 403

U.S. 88, 102 (1971); see also Alexis v. McDonald's Rests., 67 F.3d 341, 349 (1st Cir. 1995).

Because there is insufficient evidence in the summary judgment record to support a finding that

the defendants' actions were motivated by discriminatory animus toward Cheung on account of

his race, summary judgment should enter on this claim as well (count I).

**D.     The Pendent State Law Claims Could be Dismissed Without Prejudice**

Cheung's summary judgment presentation fails to preserve any of his federal claims over

which this court has original jurisdiction and the complaint does not set forth any allegation

concerning Cheung's state of residence other than the fact that he was a resident of Lincoln when

the events underlying this lawsuit transpired.  The court would act within its discretion, in my

view, if it were to dismiss the remaining state law claims without prejudice.  See Flynn v. City of

Boston, 140 F.3d 42, 48 (1st Cir. 1998).  Nevertheless, for the sake of judicial economy, I have

reviewed the remaining claims and, based on that review, am inclined to think that the parties

---

[7]      The Town defendants raise an additional issue as to whether a § 1981 claim can be pursued against a state
actor or entity.  It appears that there is currently a divergence of opinion among the Circuit Courts of Appeals as to
whether Congress's 1991 amendments to § 1981 overruled Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989), "in
which the Supreme Court held that 'the express cause of action for damages created by § 1983 constitutes the
exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'"  Burns v. Bd.
of County Comm'rs, 330 F.3d 1275, 1288 n.10 (10th Cir. 2003) (quoting Jett, 491 U.S. at 733 and collecting cases).

and the judicial system would be better served by disposing of the pendent claims at this juncture.

**E.      Emotional Distress**

Maine law recognizes two types of emotional distress claims: "intentional infliction" claims and "negligent infliction" claims.  In order to sustain a claim for intentional infliction of emotional distress, a claimant must have evidence capable of supporting factual findings that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23 (internal quotation marks omitted).  A claim of negligent infliction of emotional distress can be maintained based on less than intentional and reprehensible conduct.  However, the universe of potential defendants is actually smaller, id., 2001 ME 158, ¶ 17, 784 A.2d at 25, because the claim is only recognized in Maine "in circumstances in which a special relationship exists between the actor and the person emotionally harmed" or where the claimant observes an otherwise tortious and injurious act committed against one with whom he or she has a special relationship.  Id., 2001 ME 158, ¶ 19, 784 A.2d at 25-26.  As with the intentional infliction claim, a negligent infliction claim also requires proof of "severe emotional distress."  Id., 2001 ME 158, ¶ 20, 784 A.2d at 26.

Cheung clarifies in his summary judgment memorandum that his emotional distress claims are being pressed only against the Wambolts.  The Wambolts assert that the intentional infliction claim is not sustainable against them because the conduct fairly attributable to them was not "extreme and outrageous."  (Wambolts' Mot. at 10-11.)  They challenge the negligent

infliction claim based on the absence of any duty of care; according to them, the landlord-tenant relationship is not a "special relationship."  (Id. at 11-12.)  In opposition, Cheung asserts that the Wambolts' conduct was outrageous because they tried to get him to sign the notice to quit the premises, urged the Lincoln Town Council to rescind South Garden's restaurant permit, attempted to evict Cheung and South Garden through legal process, contacted the State Fire Marshal's Office and the State Liquor Licensing Board to solicit inspections of the premises, erected the row of saw horses in front of the restaurant, and frequently sought police intervention.  (Opp'n to Wambolts' Mot. at 19-21.)  Contrary to Cheung's contention, these acts do not rise to the level of being "atrocious" and "utterly intolerable in a civilized community." See, e.g., Botka v. S.C. Noyes & Co., 2003 ME 128, ¶¶ 10, 19, 834 A.2d 947, 951, 953 (affirming entry of summary judgment based on lack of outrageous conduct where plaintiffs' statement of material facts asserted that the defendants, among other things, "(1) interfered with . . . business activities; (2) frequently interrupted, berated, insulted, and harassed the [plaintiffs] alone or in front of clients or others; (3) initiated a physical confrontation . . .; (4) acted imperiously; (5) threatened . . . eviction from the premises and disrupted . . . use of the premises").  As for the negligent infliction claim, there is nothing special about the landlord-tenant relationship between the Wambolts and Cheung or South Garden.  This ordinary business relationship is not the kind of "unique relationship" from which a special duty of care will arise to avoid causing emotional harm.  See Veilleux v. NBC, 206 F.3d 92, 130-31 (1st Cir. 2000) (collecting cases).  Summary judgment should enter against counts V and VI.

**F.      Economic Interference**

        Maine law recognizes a tort claim for interference with an advantageous economic relationship.  To establish such a claim, a claimant must demonstrate "the existence of a valid

contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference." Barnes v. Zappia, 658 A.2d 1086, 1090 (Me. 1995). The defendants argue that summary judgment must enter against the interference claim because of an absence of either fraud or intimidation. (Wambolts' Mot. at 12-13; Town's Mot. at 13-16.) Cheung asserts that the facts could support a finding of intimidation. Specifically, he maintains that the Town intimidated Cheung and South Garden by rescinding his amusement permit, that the Wambolts intimidated South Garden customers by erecting the saw horse "fire lane" in front of the South Garden, that Michael Knights intimidated customers by assigning special details to the Briarwood parking lot and conducting frequent "drive-bys" on the weekend and that an unnamed police officer intimidated a patron by issuing a citation in relation to the customer's disregard toward the Wambolts' "fire lane." (Opp'n to Wambolts' Mot. at 26-27; Opp'n to Town's Mot. at 23). My assessment is that the facts are not sufficient to support a finding of "intimidation," which generally signifies an act capable of placing a person in fear of harm. Town & Country Motors, Inc. v. Bill Dodge Auto. Group, Inc., 115 F. Supp. 2d 31, 33 (D. Me. 2000) (reasoning that intimidation means a "threat a defendant made that was within its control to fulfill"); State v. Janiszak, 579 A.2d 736, 738 (Me. 1990) ("Intimidation may be defined as unlawful coercion, extortion, duress, or putting in fear.") (addressing Maine statute criminalizing the obstruction of government administration and quoting Black's Law Dictionary 736 (5th ed. 1979)). There simply is no evidence in this record that the acts Cheung complains of involved any threatening statements or other acts designed to place anybody in fear. Accordingly, summary judgment should enter against this claim (count VII).

**G.      5 M.R.S.A. § 4684-B**

Maine's Civil Rights Act, 5 M.R.S.A. §§ 4681-4685, affords certain "additional protections" to persons by, among other things, making it unlawful to physically prevent their "ingress to or egress from a building" or to render "passage to or from a building unreasonably difficult or hazardous."  5 M.R.S.A. § 4684-B.  The Wambolts argue that Cheung cannot sustain a claim under this provision because the "fire lane was removed after a few days and never once rendered impassable ingress or egress to the South Garden or rendered passage to the building unreasonably difficult or dangerous."  (Wambolts' Mot. at 14.)  The Town defendants similarly argue that the claim cannot succeed against them because there is no evidence of any police officer or other town agent interfering with the ability of South Garden patrons to enter or depart the restaurant.  (Town's Mot. at 16.)  In response, Cheung argues that the statute was violated based on all of the facts related to the entire spectrum of his claims, as though § 4684-B were not limited to protecting persons from the specific acts enumerated in subsections (2)(A) through (2)(D).  (Mem. in Opp'n to Town's Mot. at 27-28; Opp'n to Wambolts' Mot. at 30-31.)  In any event, among Cheung's arguments is an argument that the defendants blocked access to the restaurant: the Wambolts by erecting the saw horse "fire lane" and the Town defendants by facilitating the Wambolts in this effort while refusing to help Cheung.  Unfortunately for Cheung, his own statement of additional material facts does not back up this claim.  Cheung asserts only that the saw horses limited access and discouraged patronage.  It is implicit in such a statement that ingress and egress were not prevented.  I recommend that summary judgment enter on this claim (count VIII).

## H.    Punitive Damages

Because no substantive cause of action remains to support Cheung's plea for punitive damages, judgment must enter against count IX as a matter of law.  See South Port Marine, LLC

v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 64 (1st Cir. 2000) ("Punitive damages . . . do not constitute a separate cause of action, but instead form a remedy available for some tortious or otherwise unlawful acts.  Consequently, plaintiff's claim for punitive damages must relate to some separate cause of action which permits recovery of punitive damages.").

### Conclusion

For the reasons stated herein, I **RECOMMEND** that the court **GRANT** the defendants' motions for summary judgment (Docket Nos. 14 & 24).

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  June 2, 2005